
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 10, 2017

## STATE OF TENNESSEE v. WESLEY HOWARD LUTHRINGER

**Appeal from the Circuit Court for Bedford County**
No. 18086    Forest A. Durard, Jr., Judge

_____

### No. M2016-00780-CCA-R3-CD

_____

Wesley Howard Luthringer ("the Defendant") was convicted of two counts of aggravated vehicular homicide by a Bedford County jury. The trial court sentenced the Defendant to twenty-four years for each count to be served consecutively as a Range I standard offender. On appeal, the Defendant argues that the evidence was insufficient for a rational juror to find him guilty of aggravated vehicular homicide beyond a reasonable doubt and that the trial court erred in ordering his sentences to be served consecutively. After a thorough review of the record and case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Andrew Jackson Dearing, III (on appeal and at trial) and Michael J. Collins (at trial), Shelbyville, Tennessee, for the appellant, Wesley Howard Luthringer.

Herbert H. Slatery III, Attorney General and Reporter; Leslie Price, Senior Counsel; Robert J. Carter, District Attorney General; and Michael D. Randles and Richard Cawley, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

#### I. Factual and Procedural Background

On May 19, 2014, the Bedford County Grand Jury indicted the Defendant for two counts of aggravated vehicular homicide. On June 15, 2015, the Bedford County Grand Jury issued a superseding indictment charging the Defendant with two counts of

vehicular homicide and four counts of aggravated vehicular homicide on alternative theories.

*Jury Trial*

Joey Story testified that he was a paramedic supervisor for the Bedford County EMS. On February 24, 2014, he responded to a call regarding a motor vehicle accident on Highway 82 East and saw "a white either SUV or van-style vehicle upside down on its roof" in the ditch a few feet from the roadway. Mr. Story was unable to see anything from the driver's side because of the extensive damage. From the rear passenger's side, he saw "a victim [lying] on the roof of the vehicle." After determining that the victim did not have a pulse, he walked to the front of the vehicle and saw another victim "that was partially ejected [lying] prone, which is face down, in the dirt with the vehicle crushed on top of him." After Mr. Story determined that the two victims were deceased, he kicked out the glass of the rear passenger sliding door and entered the vehicle to continue checking for victims. After entering the vehicle, Mr. Story again checked the rear passenger victim's pulse and felt the bones in the victim's neck move, "[w]hich is a big indication that there's a fracture of the neck or the spinal column." He smelled "[a] strong smell of alcohol" inside the vehicle and saw "beer cans strewed [sic] through[out] the vehicle." Mr. Story then saw "a pool of blood towards the front of the vehicle[]" and found a third individual "in the driver's seat, upside down." He could not extract the individual from the driver's seat due to the damage of the driver's compartment. Mr. Story testified that this victim was breathing and moaning.

Mr. Story and the other first responders began extricating the individual in the driver's seat by lifting the vehicle up and cutting out the driver's door. Mr. Story was then able to determine that the man in the driver's seat was upside down, wedged between the steering wheel and the dash, and wearing a seatbelt. Mr. Story cut the driver's seatbelt, maneuvered the victim out of the vehicle, and moved him by stretcher to a waiting ambulance. Mr. Story administered a saline solution through an IV to increase his blood pressure. After the individual in the driver's seat was taken to a hospital, Mr. Story walked around the accident scene and noticed beer cans, garbage, and personal items scattered around the wreck. Mr. Story also noticed that the vehicle had struck the trees near the accident "several feet" above the ground. Before the jury, Mr. Story identified the Defendant as the man in the driver's seat. Mr. Story testified that the two deceased victims were later identified as Ronald Neely, Jr. and Donald Lazas III.

On cross-examination, Mr. Story testified that when the first responders rolled the wrecked vehicle over, beer cans rolled out of the vehicle. Mr. Story also testified that the Defendant was given "a 500 ML bolus of normal saline[]" through the IV. On redirect-examination, Mr. Story stated that the 500 ML of fluid was "rapidly induced," meaning that he squeezed 500 ML of fluid into the IV as quickly as possible and left another 500 ML in the bag of saline fluid to continuously drip through the IV.

Trooper Barry Qualls, Jr., testified that on February 24, 2014, he was dispatched to a crash scene on Highway 82 East. When Trooper Qualls arrived at the scene, he observed that only one vehicle was involved in the accident, a white Kia Sedona minivan. Trooper Qualls determined that the vehicle had been traveling eastbound on Highway 82, crossed the centerline, and left the road. Trooper Qualls testified that "[w]hen the vehicle went off the left-hand side of the roadway, you could actually see the marks up on the tree where the vehicle ha[d] actually struck the trees." Trooper Qualls testified that the marks on the trees from the vehicle were between five and seven feet above the ground. He testified that he observed Mr. Story enter the vehicle to confirm that the victims on the passenger side of the car were deceased, but he could not see the Defendant in the driver's seat from the outside of the vehicle. Once the fire department cut off the driver's door, Trooper Qualls observed that the driver's seatbelt was fastened. Trooper Qualls then identified the Defendant as the driver of the wrecked vehicle. After the Defendant was removed from the vehicle, Trooper Qualls attempted to ask him some questions to learn his identity. Trooper Qualls stated that he stood at the Defendant's shoulders, less than a foot and a half away, when he attempted to speak with the Defendant. Trooper Qualls testified that he "could smell a strong smell of alcoholic beverage coming from [the Defendant's] person." He ultimately identified the Defendant from the Defendant's driver's license. Trooper Qualls stated that he was able to identify Mr. Neely at the scene based upon Mr. Neely's driver's license, but he was unable to immediately identify Mr. Lazas. He also testified that the speed limit of the section of Highway 82 East where the accident occurred was fifty-five miles per hour.

Trooper Timothy Hearn testified that he was assigned to the Critical Incident Response Team ("CIRT") of the Tennessee Highway Patrol. After the trial court admitted Trooper Hearn as an expert in crash reconstruction, Trooper Hearn testified that he investigated the crash at issue on February 24, 2014. When Trooper Hearn arrived at the scene around 9 a.m., another trooper showed Trooper Hearn the evidence that had been previously collected. Trooper Hearn photographed the scene and made a diagram of the crash using surveying equipment. He measured the curve in Highway 82 East where the crash was located to determine the critical speed, the maximum speed a car can travel on a curve without sliding. Trooper Hearn estimated the critical speed of the curve to be between sixty-two and sixty-seven miles per hour. Trooper Hearn testified that the tire marks depicted on the crash diagram were "load shifting," indicating "a sudden jerk to

the right on the steering wheel." Trooper Hearn did not find any skid or braking marks on the roadway, which indicated that the vehicle did not brake prior to driving off the left side of Highway 82 East. Trooper Hearn was unable to determine the speed of the vehicle at the time of the crash. Based on the after-crash diagram, Trooper Hearn testified that the vehicle was "11.9386 feet across the centerline" when the vehicle began sliding and created the tire marks. Trooper Hearn testified that the road was dry when the crash occurred. He testified that the reaction time for the average person is one and a half seconds, so the average person driving sixty miles per hour would travel about 130 feet before braking. Trooper Hearn also stated that he observed a second set of tire marks "in the dirt and grass area of the shoulder of the roadway." Trooper Hearn was unable to determine if these marks were made from a locked wheel or a rotating wheel. Trooper Hearn testified that he also observed a "gouge area" which was "a big area in the dirt where the grass and all has been move[d] and knocked out of the way." Trooper Hearn testified that after the vehicle created the gouge area, it became airborne and traveled approximately twenty-two feet before hitting three trees and coming to a stop. Trooper Hearn noted that the vehicle rotated while it was airborne so that "the top of the van, the roof and the hood, is what actually struck the side of that tree." Trooper Hearn estimated that the vehicle struck the first tree "about eight feet from the ground."

Trooper Hearn also created a diagram of the wrecked vehicle, showing where the vehicle was damaged from striking the trees. Trooper Hearn then inspected the vehicle. Trooper Hearn testified that at the time of inspection the vehicle's transmission was in reverse, but he did not know when the vehicle was put in reverse. However, Trooper Hearn testified that the vehicle was not in reverse at the time of the crash. Trooper Hearn testified that the driver and front passenger seat airbags deployed and that the left front tire had become unseated from the rim in the crash. He also testified that the steering system was operable but appeared to have been damaged in the crash because the left front wheel and the "suspension components" were "severely damaged." Trooper Hearn testified that the seatbelts were operating correctly and that "the driver's seatbelt was in use at the time of the crash." Trooper Hearn testified that the brake pedal was in the up position, which "tends to mean [that] there's still fluid pressure in the system and that the brakes were functioning properly." Trooper Hearn did not find any mechanical malfunction in the vehicle during his inspection. Trooper Hearn obtained a certified copy of the vehicle's registration and determined that Mr. Neely owned the vehicle. Trooper Hearn testified that he determined that all required recalls had been performed on the wrecked vehicle except a recall for a rear door latch. Trooper Hearn testified that, even if that latch had not been functioning, it would not have contributed to the crash.

On cross-examination, Trooper Hearn testified that, even if a vehicle had antilock brakes, the vehicle would still create marks if it braked before crashing. Trooper Hearn agreed that, if a deer jumped out in front of a vehicle, a driver might attempt to swerve

- 4 -

out of the path of the deer rather than braking. However, Trooper Hearn testified that a deer jumping in front of the vehicle was not likely a factor in the crash because "there [was] evidence on the roadway of the tire marks that were left either due [to] a sudden movement or the car could have just been at that point where it was starting to lose lateral stability or slide-slip on the roadway." Trooper Hearn agreed that it was possible that the vehicle could have been traveling at the speed limit and traveled left and then to the right on the roadway to avoid an obstacle.

On redirect-examination, Trooper Hearn testified that a vehicle without antilock brakes would create a skid mark that would be the full width of the tire and "would start out light and get darker as it goes further on" and would be "continuous and unbroken." Trooper Hearn stated that a vehicle with antilock brakes would create a skid mark that was also the width of the tire, but the mark would not be continuous because the antilock braking system would not allow the tire to lock. On recross-examination, Trooper Hearn testified that load-bearing marks are created when the vehicle's weight "rides up on the shoulder of the tire." Trooper Hearn stated that, if a vehicle made a sharp, quick turn to the left, the vehicle's weight would shift. Trooper Hearn stated that if the vehicle had been traveling below the speed limit, he would not have expected to see any load-bearing marks; in contrast, if the vehicle had been traveling above the speed limit, Trooper Hearn would have expected to see load-bearing marks.

Daniel Ray Webster testified that he was the Parts and Service Director at Cumberland Automotive in Cookeville, Tennessee. Mr. Webster testified that Cumberland Automotive or its predecessor had maintained Mr. Neely's Kia Sedona since 2006. Mr. Webster testified that three recalls had been performed on the vehicle in question: a rear brake line adjustment, service on a sliding door cable, and a stop lamp switch replacement. Mr. Webster noted that a "service action" for the rear door latch replacement had not been performed on the vehicle but also stated that it was not a government-mandated recall. Mr. Webster stated that he had examined the wrecked vehicle and observed that the rear door latch on the vehicle operated correctly even after the wreck. Mr. Webster testified that there was no possibility that the failure to complete the service action on the rear door latch could have "contribute[d] to a loss of steering or an inability to control the vehicle on the roadway[.]" Additionally, Mr. Webster stated that a service recall for the front lower control arm had not been performed on Mr. Neely's van, but he explained that this service recall only applied to vehicles titled in northern states where vehicles can rust. Mr. Webster testified that, when he inspected Mr. Neely's vehicle, he checked the front lower control arm and confirmed that the front lower control arm on the vehicle had "[v]ery little surface rust[]" and that the part was operating correctly at the time of the wreck. He stated that he did not see any mechanical defects during his inspection that could have contributed to the wreck.

On cross-examination, Mr. Webster agreed that, if the rear brake line adjustment recall had not been performed, the vehicle could experience "chafing" and could lose brake pressure, which could cause the vehicle to swerve. Mr. Webster testified that the rear brake line adjustment recall had been performed on the vehicle in April 2008 and that the vehicle had antilock brakes. He stated that, if the rear brake had lost fluid and pressure, the brakes in the other three wheels would still operate. Mr. Webster stated that he was not aware of any fatal crashes caused by a rear brake line that had not been serviced. On redirect-examination, Mr. Webster stated that when he inspected the vehicle, he specifically examined the rear brake line and found that there was no "chafing" or leaking brake fluid and the brake line was still intact after the wreck.

Sergeant John Grinder testified that, in February 2014, he was the midnight supervisor for the third district of the Tennessee Highway Patrol, which includes Davidson County and several neighboring counties. Sergeant Grinder testified that he was contacted by Sergeant Monty Terry around 4:40 a.m. on the morning of February 24, 2014. Sergeant Terry asked Sergeant Grinder to go to Vanderbilt University Hospital to supervise the blood draw of the Defendant. Sergeant Grinder testified that the Defendant was unconscious during the blood draw. Sergeant Grinder stated that he "smell[ed] the odor of an alcoholic beverage coming from [the Defendant]" while he observed the Defendant's blood being drawn.

Melinda Quinn testified that she worked as a forensic scientist for the Tennessee Bureau of Investigation ("TBI") at the Nashville crime lab. After the trial court admitted Ms. Quinn as an expert in forensic toxicology, Ms. Quinn testified that when she received the sample of the Defendant's blood she noticed that the sample "appeared to be thin or watery." Ms. Quinn tested the Defendant's blood sample for alcohol and determined that the BAC was 0.21. Ms. Quinn testified that because the Defendant had been given saline prior to the blood draw the saline "could [have] potentially dilute[d] the blood alcohol [content] . . . ." She stated that an average person could metabolize approximately one alcoholic drink per hour and that "to reach a [0].21 [BAC], an average person drinking all at one time[] would require between [nine] and [eleven] drinks." Ms. Quinn also testified that alcohol was a "central nervous system depressant" that can impair reaction time and "critical judgment" skills.

Dr. David Zimmerman testified that he was a medical examiner for Davidson County. After the trial court admitted Dr. Zimmerman as an expert in forensic pathology, Dr. Zimmerman testified that he reviewed the autopsies of Mr. Neely and Mr. Lazas which were performed by Dr. Bridgett Eutiner, who was unavailable to testify. Dr. Zimmerman testified that Mr. Neely had sustained abrasions, contusions, and lacerations, and that there was also blood in the spaces surrounding the brain[.]" Dr. Zimmerman agreed that it takes a significant amount of force to cause bleeding in the brain. He also

stated that Mr. Neely had abrasions and bruises on his torso, a torn diaphragm, a transected aorta, multiple tears and bruises on his liver, tears on his spleen, bruises on his small intestine, lacerations on his right kidney and right adrenal gland, contusions to his right lung and left lung and fractures to his thoracic vertebrae, ribs, and sternum. Dr. Zimmerman testified that the cause of Mr. Neely's death was "multiple blunt force injuries[.]" He stated that a sample of Mr. Neely's blood from a femoral artery was tested and had a 0.09 BAC. Additionally, a sample of Mr. Neely's eye fluid was tested and showed a 0.12 BAC. Dr. Zimmerman explained that "the [BAC] level that we see in the eye fluid is the level that was in the blood approximately an hour before [the victim's death.]" Therefore, Mr. Neely's BAC was 0.12 an hour before his death, and his BAC was 0.09 at the time of his death. Dr. Zimmerman explained that the drop in BAC indicated that Mr. Neely stopped consuming alcohol "some time prior to the time of death."

Dr. Zimmerman testified that Mr. Lazas sustained contusions and lacerations to his face, pericardium, aorta, interior right ventricle of the heart and atria, right lung and left lung, colon, liver, spleen, and the tissue that surrounds the pancreas. Additionally, Mr. Lazas sustained rib, sternum, skull, thoracic vertebrae, and cervical vertebrae fractures. Blood was found between different layers of tissue between the skull and the brain. Dr. Zimmerman stated that these types of hemorrhages "can be caused by impacts on the head" such as "[a] significant injury, typically like you would see in a motor vehicle crash." Additionally, Mr. Lazas sustained an "internal decapitation" because the ligaments between the skull and first cervical vertebrae were torn. Dr. Zimmerman also testified that Mr. Lazas sustained Dr. Zimmerman testified that the cause of Mr. Lazas' death was "multiple blunt force injuries." Dr. Zimmerman stated that tests showed that Mr. Lazas' blood had a 0.143 BAC and his eye fluid had a 0.154 BAC.

At the conclusion of the State's proof, the trial court conducted a Momon hearing, and the Defendant elected to not testify. The jury found the Defendant guilty of two counts of vehicular homicide by intoxication for the deaths of Mr. Neely in count one and Mr. Lazas in count two. In the second phase of the bifurcated trial, the jury found the Defendant guilty of two counts of aggravated vehicular homicide for the deaths of Mr. Neely in count three and Mr. Lazas in count four by having a BAC of 0.20 or more and having at least one prior DUI. These convictions were based on Ms. Quinn's lab report disclosing the Defendant's 0.21 BAC and certified copies of the judgments of the Defendant's three prior DUI convictions. The jury also found the Defendant guilty of two counts of aggravated vehicular homicide for the deaths of Mr. Neely in count five and Mr. Lazas in count six by having at least two prior DUI convictions, based on the certified copies of the judgments of the Defendant's three prior DUI convictions.

At a subsequent sentencing hearing, Jenna Miller testified that she prepared the Defendant's presentence report for the Department of Correction. Ms. Miller testified that the Defendant was convicted of manufacturing methamphetamine on February 25, 2013, and that he was sentenced to five years for this conviction by the Sequatchie County Circuit Court. Ms. Miller also testified that the Defendant was convicted of a DUI second offense on the same date and was sentenced to eleven months and twenty-nine days by the Sequatchie County Circuit Court; the Defendant was ordered to serve forty-five days of this sentence concurrently with the drug conviction sentence. On May 10, 2013, the Defendant was furloughed to visit his dentist, and when he returned to jail, the Defendant "smelled strongly of alcohol." The Defendant's blood was tested and showed a 0.08 BAC, and the Defendant was charged with public intoxication. Ms. Miller testified that on August 8, 2013, the Sequatchie County Circuit Court ordered that the Defendant be released on furlough to the Tony Rice Center ("the Center") in Bedford County for inpatient treatment.[1] On June 6, 2014, the Defendant's probation was fully revoked because the Defendant had been charged with the current crimes. Ms. Miller agreed that the Defendant "never completed his jail sentence in Sequatchie County to make it to active probation before he actually got fully violated and sent to the Department of Correction[.]"

Kathy Lazas testified that she was the mother of one of the deceased victims, Mr. Lazas. She stated that "[t]he fact that [the Defendant had not] apologized to [her] family sp[oke] volumes to [them]. It show[ed] [them] that [the Defendant had] no remorse." Katie Lazas Painter testified that she was Mr. Lazas' sister and that the loss of Mr. Lazas had "deeply changed" her. Donald Lazas[2] testified that he was Mr. Lazas' father and that Mr. Lazas had struggled with hearing loss, learning disabilities, and a mild form of autism but that in the last six months of his life Mr. Lazas "had new hope for his future." Donald Lazas also stated that the Defendant's behavior indicated "a very high risk that [he would] continue to act in this manner of total disregard for [him]self, [his] family, and the safety of others by drinking and driving." Candace Neely testified that Mr. Neely was her brother and shared a written statement from Vera Neely, Mr. Neely's mother. In the written statement, Ms. Vera Neely noted that the Defendant had not contacted the

---

[1] Ms. Miller testified that the Defendant's probation was partially revoked on June 24, 2013, on the basis that the Defendant tested positive for alcohol. The Defendant was ordered to serve two years in jail and then return to probation until June 24, 2018. Ms. Miller testified that the partial revocation order noted that the Defendant "[m]ay be furloughed to an inpatient rehab program, [twelve] months in this case shall be served consecutively to [the] original [twelve]-month sentence."

[2] Because the victims share the same last name as some of their family members who testified at the sentencing hearing, we will refer to some of the victims by their first names. We intend no disrespect.

Neely family to apologize. Ms. Vera Neely stated that Mr. Neely's brother's and sister's lives had "been ripped apart[]" and that Mr. Neely's oldest daughter "has [had] a terrible time with it all." Ms. Vera Neely noted that Mr. Neely's son "gets angry[]" and "blinks his little eyes when he's talking about his daddy, trying to keep his eyes from tearing up." Ms. Vera Neely also stated that Mr. Neely's youngest daughter "cries at school." In her own statement, Ms. Candace Neely noted that her mother, Ms. Vera Neely, called the hospital after the wreck to check on the Defendant and that it was disrespectful of her family for the Defendant to laugh and "cutup" in the courtroom. Michelle Haggard testified that she was the mother of Mr. Neely's children and stated that she had "spent countless hours holding them while they cry."

After the State rested, Lori Luthringer testified that she was the Defendant's step-mother and that she was sorry for the Neely and Lazas families' losses. Ms. Luthringer stated that the wreck had ruined the Defendant's life and his children's lives. The Defendant testified that previously he was at the Tony Rice Center on furlough for alcohol rehabilitation. The Defendant testified that he met the victims, Mr. Lazas and Mr. Neely, at the Center and became friends with them. The Defendant stated that the Center allowed some individuals to leave and that he, Mr. Lazas, and Mr. Neely would leave the Center and drink alcohol together. The Defendant testified that the house manager did not check on individuals when they returned to the Center. The Defendant testified that he did not remember the events of February 24, 2014. He explained that he did not plead guilty because "it didn't make sense to [him] why [he] would have been driving [Mr. Neely's] car." The Defendant agreed that he did not try to contact the Lazas or Neely families before he was represented by counsel because he "couldn't get an address or a phone number" and that after he was represented by counsel, he did not contact the families because his lawyers advised against it. The Defendant then made an allocution and apologized to both families. The Defendant stated that the last thing he remembered was "being at an AA meeting at Tony Rice Center around the bonfire." On cross-examination, the Defendant agreed that he received his GED from the Taft Juvenile Detention Facility. He testified that he had been placed at Taft for "a high-speed car chase" when he was "under the influence of pills[.]" The Defendant stated that he had not been treated for his illegal usage of prescription drugs as a juvenile. He agreed that while he was at the Center for alcohol rehabilitation, he was told that he should avoid alcohol. The Defendant agreed that he informed Ms. Miller for the purposes of the presentence report that the last time he consumed alcohol was the day of the wreck, but he also agreed that he was charged with public intoxication in June 2014. The Defendant explained that he had forgotten about the public intoxication charge due to a brain injury.

The trial court stated that it had considered the victim impact statements included in the presentence report as well as testimony during the sentencing hearing for the purposes of establishing the length and manner of service of the Defendant's sentence.

The trial court stated that the Defendant was a standard, Range I offender. The trial court found that the Defendant had a "[p]revious history of criminal convictions or behavior" noting that the Defendant had fourteen prior convictions that could be considered under this factor, including "minor traffic infractions[,]" possession of drug paraphernalia, failure to appear, "leaving the scene of an accident involving vehicular damage[,]" driving with a revoked license, driving without a seatbelt, possession of drugs, manufacture of methamphetamine, DUI, and public intoxication. The trial court noted that it could not consider two of the Defendant's prior DUI convictions under this factor because the convictions had been used to establish the current convictions. The trial court stated that it placed "considerable weight" on this factor "because of the prior history involving substance abuse in the operation of an automobile."

The trial court also found that "before trial or sentencing [the Defendant] failed to comply with conditions of a sentence involving release into the community[]" because "[t]his accident happened when [the Defendant] was released into the community to the care of the Tony Rice Center . . . ." The trial court stated that it gave this factor "some weight." The trial court further found that, at the time of the offense, the Defendant was "on some type of judicial release, because he was not in jail or in the penitentiary." The trial court gave this factor "quite a bit of weight" because the Sequatchie County Circuit Court sent the Defendant "to a rehabilitation center, in an effort to try to save his life." The trial court found that no mitigation factors applied to the Defendant's case. The trial court merged the conviction for count five into count three and merged the conviction for count six into count four and sentenced the Defendant to twenty-four year sentences for the two remaining aggravated vehicular homicide convictions.

For consecutive sentencing purposes, the trial court found that the Defendant had an extensive record of criminal activity, based on his sixteen prior convictions. The trial court stated that the Defendant's "record of drugs and drinking and driving is extensive in this particular case." Next, the trial court considered whether the Defendant was a dangerous offender under Wilkerson and noted that the consequences of the Defendant's crimes were foreseeable. The trial court found that the Defendant was "a dangerous offender as demonstrated by the facts of this case and by his previous criminal history and activity." The trial court found that consecutive sentencing was "reasonably related to the severity of the offense" and would "protect the public from further criminal conduct by the [D]efendant." The trial court also found that consecutive sentencing was "congruent with the general principles of sentencing[]" because the Defendant's "prior criminal history is not in keeping with good citizenship and the morals of society[]" and "shows a history of severe alcohol and drug abuse, and a complete failure to respect authority and the Court's authority and the privileges of being released into the community." The trial court additionally found that there were "aggravating factors surrounding the commission of the offense[]" because one could logically infer that the

vehicle that the Defendant was driving was traveling at a speed in excess of the critical speed for that portion of the road. The trial court noted that another aggravating factor was that the Defendant had a 0.21 BAC at the time it was drawn in the hospital. Based on these factors, the trial court ordered the twenty-four year sentence for count four to run consecutively to the sentence for count three, for an effective sentence of forty-eight years with a thirty percent release eligibility. This timely appeal followed.

## II. Analysis

### *Sufficiency of the Evidence*

In his first two issues, the Defendant challenges the sufficiency of the evidence of his convictions.[3] The Defendant argues that "there just was not enough evidence to prove beyond a reasonable doubt all the elements of the crimes as charged." The Defendant further argues that "[t]here was testimony that was purely speculative as to [the Defendant's intentions" and that "[t]he evidence presented against [the Defendant] to the jury [was] highly circumstantial." The State responds that the evidence, when viewed in the light most favorable to the State, was sufficient for a rational juror to find the Defendant guilty of two counts of aggravated vehicular homicide beyond a reasonable doubt.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact-finder. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. Id. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914

---

[3] The Defendant raised three issues in his appellate brief. Issue I contains one sentence and argues that "[t]he evidence contained in the record is insufficient as a matter of law to sustain a conviction for 2 counts of aggravated vehicular homicide[.]" Issue II argues that "[t]he verdict of the jury is contrary to the law and the evidence." While the issue statement of Issue II is phrased in language applicable to the standard of review for a motion for new trial, the Defendant essentially raises a sufficiency of the evidence argument in his analysis, and we will address it as such. Issue III challenges consecutive sentencing and is addressed below.

(Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. Bland, 958 S.W.2d at 659; Tuggle, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

As applicable to this case, "[v]ehicular homicide is the reckless killing of another by the operation of an automobile . . . as the proximate result of . . . [t]he driver's intoxication, as set forth in § 55-10-401." Tenn. Code Ann. § 39-13-213(a)(2) (2016). As relevant here, vehicular homicide is aggravated when the defendant has two or more prior DUI convictions at the time of the offense or when "[t]here was, at the time of the offense, twenty-hundredths of one percent (0.20%), or more, by weight of alcohol in the defendant's blood and the defendant has one (1) prior conviction for . . . [d]riving under the influence of an intoxicant[.]" Tenn. Code Ann. § 39-13-218(a)(1)(A), (a)(3)(A) (2016).

The Defendant erroneously relies on State v. Crawford, 470 S.W.2d 610, 613 (Tenn. 1971), for his contention that the evidence was insufficient for a rational juror to have found beyond a reasonable doubt that he was guilty of aggravated vehicular homicide, stating that "[i]n order to convict on circumstantial evidence alone, the facts and circumstances must be so closely interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone." We note that Crawford's precedent regarding circumstantial evidence has been overruled by Dorantes. See Dorantes, 331 S.W.3d at 381. Further, the United States Supreme Court has rejected the requirement that a prosecution based solely on circumstantial evidence must "rule out every hypothesis except that of guilt beyond a reasonable doubt[.]" Jackson, 443 U.S. at 326.

Regardless, the Defendant was not convicted solely on circumstantial evidence. At trial, Mr. Story and Trooper Qualls testified that they found the Defendant pinned into the wrecked vehicle in the driver's seat. Trooper Qualls and Sergeant Grinder testified that the Defendant had a strong odor of alcohol about his person when they stood near him. Further, Ms. Quinn testified that the Defendant's BAC at the time of testing, after the wreck and after the Defendant received 500 ML of saline solution, was 0.21. Trooper Hearn and Mr. Webster testified that they inspected the wrecked vehicle and found no mechanical defects that could have contributed to the wreck. Dr. Zimmerman testified that Mr. Neely and Mr. Lazas died from multiple blunt force injuries and that some of their injuries, such as hemorrhaging, were "[a] significant injury, typically like you would see in a motor vehicle crash." The State submitted direct evidence of the Defendant's prior DUI convictions, specifically certified copies of the judgments. It was within the province of the jury to infer that the Defendant had driven and wrecked the vehicle while

- 12 -

intoxicated and that Mr. Neely and Mr. Lazas died as a proximate result of the Defendant's intoxicated driving and the resulting crash. When the evidence is viewed in the light most favorable to the State, there is sufficient evidence for a rational juror to have found the Defendant guilty of two counts of aggravated vehicular homicide beyond a reasonable doubt. The Defendant is not entitled to relief.

*Consecutive Sentencing*

The Defendant argues that the trial court erred in ordering his two twenty-four-year sentences to be served consecutively because "the offenses were as [sic] a result of a common scheme, plan and criminal design." In the alternative, the Defendant asks this court to "reduce his sentence to [the] minimum within the Range." The State responds that "the trial court considered the relevant factors and imposed a sentence consistent with the purposes and principles of the Sentencing Act . . . ."

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" State v. Shaffer, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999)).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made in the defendant's own behalf about sentencing; and (8) the potential for rehabilitation and treatment. See Tenn. Code Ann. § 40-35-210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001); State v. Ashby, 823 S.W.2d 166, 168-69 (Tenn. Crim. App. 1991).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2014); Bise, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." Bise, 380 S.W.3d at 705-06. The party challenging

- 13 -

the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2014), Sentencing Comm'n Cmts.

In State v. Pollard, the Tennessee Supreme Court expanded its holding in Bise to trial courts' decisions regarding consecutive sentencing. State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013). In cases where the trial court orders consecutive sentences, the record must reflect at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b). Id. at 861. Any single ground is sufficient to support the imposition of consecutive sentencing. Pollard, 432 S.W.3d at 862. However, before a trial court imposes consecutive sentences based on the ground that the defendant is a dangerous offender, see Tenn. Code Ann. § 40-35-115(b)(4), the trial court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). As long as the reasons for ordering consecutive sentences are properly articulated, this court will apply an abuse of discretion standard with a presumption of reasonableness on review. Id.

The trial court ordered the Defendant's twenty-four year sentence for count four to run consecutively to his twenty-four year sentence for count three, for a total effective sentence of forty-eight years in the Department of Correction. The trial court found that the Defendant had an extensive record of criminal activity based on his sixteen prior convictions. The trial court also found that the Defendant was "a dangerous offender as demonstrated by the facts of this case and by his previous criminal history and activity." The trial court found that consecutive sentencing was "reasonably related to the severity of the offense" and would "protect the public from further criminal conduct by the [D]efendant." The trial court also found that consecutive sentencing was "congruent with the general principles of sentencing[]" because the Defendant's "prior criminal history is not in keeping with good citizenship and the morals of society[]" and "shows a history of severe alcohol and drug abuse, and a complete failure to respect authority and the Court's authority and the privileges of being released into the community."

The trial court did not abuse its discretion in ordering consecutive sentencing. First, the record supports the trial court's finding that the Defendant was an offender whose record of criminal activity is extensive. See Tenn. Code Ann. § § 40-35-115(b)(2). The Defendant had sixteen prior convictions, including convictions for DUI and manufacture of methamphetamine. Many of his convictions were driving offenses or were related to drug or alcohol abuse. Further, the record supports the trial court's finding that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. See Tenn. Code Ann. § 40-35-115(b)(4). An extended sentence

- 14 -

was necessary to protect the public from the Defendant because the Defendant had three previous DUI convictions before committing the instant offenses, which showed a disregard for the safety of others. Moreover, the consecutive sentences were reasonably related to the severity of the Defendant's offenses because two people died as a result of the Defendant's conduct.

The Defendant points to State v. Denton, 149 S.W.3d 1 (Tenn. 2004), to support his argument that the trial court abused its discretion by ordering consecutive sentencing because "the offenses were as [sic] a result of a common scheme, plan and criminal design." This court has previously noted that "[t]here is no 'common scheme or design' exception authorized under the consecutive sentencing provisions of Tennessee Code Annotated section 40-35-115." State v. Carlos Alvarez Levy, No. M2006-01448-CCA-R3-CD, 2007 WL 1028536, at *3 (Tenn. Crim. App. Apr. 4, 2007) (citing Tenn. Code Ann. § 40-35-115), perm. app. denied (Tenn. Aug. 13. 2007); see also State v. Christopher Wayne Holden, No. M2006-01447-CCA-R3-CD, 2007 WL 258434, at * 4 (Tenn. Crim. App. Jan. 30, 2007) (concluding that "[u]nder Tennessee Code Annotated section 40-35-115, no provision is made in the consecutive sentencing law to exclude offenses of a 'continuing plan[]'"), no perm. app. filed.[4] Just as this court concluded in Carlos Alvarez Levy, the Defendant's reliance on Denton is "misplaced as that case deals with evidentiary issues in terms of severance of multiple crimes, not the issue of consecutive sentencing." Carlos Alvarez Levy, 2007 WL 1028536, at *3. The Defendant is not entitled to relief on this ground.

### III. Conclusion

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

---

[4] Defense counsel, who was also defense counsel in Carlos Alvarez Levy and Christopher Wayne Holden, fails to point out in his brief that two previous panels of this court have rejected this argument, and counsel offers no reason for this court to reverse prior rulings.